**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

UNITED STATES OF AMERICA

-vs- Case No.: 2:07-cr-119-FtM-29SPC

MARK SCHWINN

---

**ORDER**

______This matter comes before the Court on the Defendant's Motion to Suppress Evidence (Doc. #22) filed on December 14, 2007. The Government's Response to Defendant's Motion to Suppress Evidence (Doc. #24) was filed on December 31, 2007. A hearing was held before the Honorable Sheri Polster Chappell, United States Magistrate Judge on January 4, 2008. The Defendant was present and represented by Russell Rosenthal, Assistant United States Public Defender. The Government was represented by Yolande Viacava, Assistant United States Attorney.

At the inception of the hearing, the Court, at the Government's request and without objection, took judicial notice of the Application and Affidavit For Search Warrant in Case number 2:07-MJ-1107-DNF as well as the Search Warrant in case number 2:07-MJ-1107-DNF which was issued by United States Magistrate Judge Douglas N. Frazier on August 8, 2007. The Government called one witness, Special Agent J. Keith Cramsey and submitted a copy of the affidavit and application for search warrant as evidence. The Defendant submitted a video disk of the Defendant's apartment, a copy of the inventory of the items seized during the search, and a copy of Special Agent Cramsey's report. The Defendant did not call any witnesses.

## FACTS

**Spec. Agt. J. Keith Cramsey** (Tr. 3 - 135)

Spec. Agt. J. Keith Cramsey (Spec. Agt. Cramsey) is a special agent with the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. He started with the Fort Myer's division in 2002. (Tr. 5:6-13). His duties including investigating crimes involving child exploitation. (Tr. 5:17-23). He has undergone basic training at the Customs Academy as well as ICE training, and advanced training on child exploitation. (Tr. 6:1-5). He is a member of the Child Abduction Response Team and receives periodic continuing training regarding child exploitation. (Tr. 6:6-8). He has worked on dozens of child exploitation cases locally, has been involved in hundreds nationally, and has authored numerous affidavits and applications for search warrants regarding child exploitation. (Tr. 6:12-16).

Spec. Agt. Cramsey began investigating the Defendant Mark Schwinn after getting his name during "Operation Flicker" in April 2006. (Tr. 7:1-25, 8:1-5). "Operation Flicker" is a national operation that originated out of the Department of Homeland Security looking for websites that contain child pornography. (Tr. 7:5-13). Once a child pornography website was located it was discovered that the website actually hosted multiple websites. (Tr. 7:13-15). Undercover transactions were purchased to gain access to the websites, to see what the content was that they were putting on the internet and to track the operators. (Tr. 7:15-19). Members of the websites were also tracked. (7:18-19). It was determined that the Defendant was one of the individuals who signed up and paid money to access the sites. (Tr. 7:11-21). During a period from September 2006 to mid October 2006, the Defendant had purchased memberships to four different known child pornography websites. (Tr. 8:1-5). In regard to the Defendant, there were two different websites, one referred to as Home

Collection, which was the initial website that launched "Operation Flicker", and the second, Angel Collection. (Tr. 8:8-15).

After receiving the intelligence information on the Defendant, Spec. Agt. Cramsey began obtaining background information by verifying information that he had received from "Operation Flicker." (Tr. 10: 17-19). He got a copy of the home page of the website Home Collection to see for himself what a prospective browser on the internet site would see before they decided to sign up for the site. (Tr. 10: 19-22) When viewing the home page for Home Collection, he was able to observe advertisements for child pornography, and there were several references on the page that it contained child pornography. (Tr. 10: 23-25, 11:1).

Armed with that information, Spec. Agt. Cramsey started running background information on the name Mark Schwinn which was the name he had received from the credit card billing information that came down from the national investigation, "Operation Flicker," and information that Spec. Agt. Cramsey developed locally. (Tr. 11:5-8, 15:5-11). Based upon the information gathered from the various databases, a search warrant was issued for the Defendant's address at 1903 Mark Avenue, Unit #302, Punta Gorda, FL 33950. (Tr. 27:6-10). To further verify the information, an agent spoke with a resident of the apartment complex at that location and determined that "Mark and Rose" lived in unit #302 which was thought to be a 3 bedroom efficiency. (Tr. 18:13-25, 14:1-2). It was also determined that the Defendant was a registered sex offender who had listed his address as the Mark Avenue address.(Tr. 19:17-23,20:1-7). The agent also obtained certified documentation of the Defendant's prior Illinois conviction from May 1998 for Aggravated Criminal Sexual Abuse of a Minor. (Tr. 20:11-17).

Spec. Agt. Cramsey also looked into the internet connection of the Defendant and found that he had been an America On Line (AOL) subscriber since February of 2005, and that his account was still active on July 31, 2007. (Tr. 20:21-25, 21:1-11). He further discovered that the e-mail address in question was the only screen name, and that Mark Schwinn was the only name on the account. (Tr. 21:13-21). AOL also returned information regarding a phone number for the Defendant which matched the phone number information from the investigation. (Tr. 22:4-9).

Spec. Agt. Cramsey testified that he included all of this information in his Affidavit in support of his request for a Search Warrant. However, he indicated that he did not include each and every fact known to him but only as much information as he believed would lead to probable cause. (Tr. 14:22-25, 15:1-6). He included in the Affidavit information regarding the National Operation, the E-mail account address and IP address for the Defendant, and the address for credit card billing information. (Tr. 15:5-16). He also included information on the number of photos on the Home Collection Website, a description of the images which appear to indicate that the website was offering child pornography, and a description of the two websites the Defendant had joined. He provided a description of the images from Home Collection 1000 and Home Collection 1001. (Tr. 55:11-22). In the affidavit, Spec. Agt. Cramsey detailed that his review of the Home Collection home page revealed they were advertising child pornography, and that anyone viewing the home page would understand the website was offering child pornography. (Tr. 16:23-25, 17:1). He testified that no additional verbal information was given to the magistrate judge at the time of the signing of the warrant and that only that which is referred to in the warrant was used for probable cause. (Tr. 53:2-17).

On cross examination, Spec. Agt. Ramsey admitted that there was nothing in the warrant that says that all of the materials on the websites constitute child pornography. (Tr. 56:1-45). He also admitted that although it was represented in the Affidavit that the Defendant had made four membership purchases for the websites, that it was never determined that he had actually accessed them. (Tr. 58:12-15). Further, there was no information that the Defendant had downloaded any information from the websites. (Tr. 58:16-25). Spec. Agt. Cramsey had received information from "Project Flicker" that the Defendant had purchased four memberships beginning in October of 2006; Angel Collection 1006 (September 29, 2006); Home Collection 1000 (October 5, 2006); Home Collection 1001 (October 7, 2006); and Angel Collection 1005 (October 14, 2006). (Tr. 57:9-15). The memberships were each for thirty (30) days. (Tr. 57:18-24). The agent did not determine whether or not the memberships went beyond the thirty (30) days. (Tr. 58: 2-6). The latest date of possible access according to the information known by Spec. Agt. Cramsey would have been November of 2006. (Tr. 59:1-7). There was approximately a ten (10) month gap between the last known date of active membership and the Search Warrant. (Tr. 61:9-14). However, Spec. Agt. Cramsey testified that based upon his training and experience, those who collect child pornography rarely dispose of it. (Tr. 62: 2-12).

Based upon a review of the Application and Affidavit for Search Warrant, the Honorable United States Magistrate Judge Douglas N. Frazier issued a Search Warrant on August 8, 2007. (Gov't. Ex. A). That Search Warrant was executed on August 17, 2007. (Tr. 27:13). The search team for the Search Warrant consisted of five (5) agents and two (2) uniformed deputies from the Charlotte County Sheriff's Office. (Tr. 27:19-22). Prior to the execution of the warrant, a meeting was held to discuss their operational plan - what they were looking for and where they were going.

Each individual was instructed on the task they would be carrying out. (Tr. 27:23-25, 28:1). One agent was in charge of being the evidence custodian, one agent was in charge of photographing, one agent was charged with drawing diagrams of the apartment and marking where items were found, and another agent was specifically there to search the unit. (Tr. 34:14-23).

Spec. Agt. Cramsey, along with the other members of the search team who wore their standard raid vests and displayed their identification, went to the residence at 1903 Mark Avenue, Unit #302. (Tr. 29:9-13, 35:18-21). Spec. Agt. Cramsey knocked on what appeared to him to be the front door of the apartment, and announced his presence. (29:15-22). The Defendant came to the door of the apartment, Spec. Agt. Cramsey identified himself, and the Defendant was asked to step outside while the agents did a security sweep of the residence. (Tr. 30:24-25,31:1-9). He was patted down for officer safety but never placed in handcuffs. (Tr. 35:24-25, 36:1-4).

The residence consisted of three (3) bedrooms which shared a common dining room, bathroom and kitchen. (Tr. 31:13-15). They discovered that one of the bedrooms was locked. (Tr. 31: 19). When asked about the locked room, the Defendant informed Spec. Agt. Cramsey that it belonged to his roommate, Willie, who was at work and that he did not have access to the bedroom. (Tr. 31: 20-23). Spec. Agt. Cramsey decided that the bedroom would not be searched. (Tr. 32:11-19).

While they were standing outside, the Defendant read the Search Warrant. (Tr. 33:23-24). The Defendant acted as if he wasn't sure why the agents were there and asked the agent to explain. (Tr. 37:13-16). Even though the Defendant had just read the Search Warrant, Spec. Agt. Cramsey explained that they were there to execute a federal search warrant looking for evidence of child

pornography and told him that someone using his name and address had purchased website information. (Tr. 38:6-11).

Spec. Agt. Cramsey asked the Defendant if he was willing to speak with him, advised him that he was not under arrest, and would not be placed under arrest at that time. (Tr. 34:2-5). He was advised that he was free to leave and that they would secure the residence when they left if he was not there. (Tr. 36:16-18 ). After the residence was swept for the protection of the officers, and initial photographs taken, Spec. Agt. Cramsey and the Defendant stepped back into the dining room area. (Tr. 33:18-22). Spec. Agt. Cramsey told the Defendant that he did not need to answer questions if he did not want to or could stop him and say he no longer wanted to speak with him. (Tr. 36:22-25, 37:1-4) Spec. Agt. Cramsey never read the Defendant his Miranda warnings during any portion of the discussions on that day. (Tr. 113:23-25, 114:1-11).

During the conversation between Spec. Agt. Cramsey and the Defendant, another agent took notes. (Tr. 39:3-4). The Defendant was allowed to smoke and drink coffee. (38:12-25). In fact, approximately one hour into the conversation, the Defendant asked to take a break and make another pot of coffee. (Tr. 42:4-13). During the time that Spec. Agt. Cramsey spoke with the Defendant, the other agents were conducting the search of the Defendant's bedroom. (Tr. 39:3-5).

During the interview, Spec. Agt. Cramsey and the Defendant spoke about his background. (Tr. 39:7-10). They spoke in detail about his prior conviction, his computer access, his relationship with his family and friends, and talked about his involvement with child pornography. (Tr. 39:12-22). Sometime during their conversation, the Defendant advised which bedroom was his and that the computer in that bedroom also belonged to him. (Tr. 100:1-25 - 104:1-20).

Bedroom one, as it was referred to in the hearing, contained two computers - a laptop computer and a desktop computer. Both were up and running at the time of the search. (Tr. 41:5-11). Bedroom two, as referred to in the hearing, contained a bicycle which the Defendant admitted was his. The bedroom appeared to be used to store things. The bed was not made and there were only a few articles in the room. (Tr. 40:3-14, 41:15-22).

It took approximately two (2) hours that day to conduct the search, photograph the residence, and to document and itemize the items seized.(Tr. 43:22-24). The interview itself began at approximately 9:04 a.m. and terminated at 11:04 a.m. (Tr. 44:2-5). Spec. Agt. Cramsey estimated the total time of the contact with the Defendant was no more than three (3) hours with thirty minutes on the front end performing a protective sweep and reading the search warrant, and thirty minutes on the back end. (Tr. 50:23-25; 51:1-8). At no time did the Defendant tell Spec. Agt. Cramsey that he did not want to speak to him, nor did he ask to leave or actually leave the premises. (Tr. 41:23-25, 42:1-4).

## DISCUSSION

The Defendant argues that the evidence gathered at his residence should be suppressed because: (1) the probable cause for the issuance of the search warrant was stale; (2) the search warrant failed the particularity requirement of the Fourth Amendment; (3) the agents exceeded the scope of the search warrant by staying on the premises longer than necessary to accomplish the warrant's objectives; and (4) the Defendant's statements were obtained in violation of his Miranda rights. The Government responds that the search warrant was valid and that any statements made by the Defendant were made voluntarily and not in violation of the dictates of Miranda.

*(1) Whether the Information Used in the Warrant was Stale*

In his affidavit and application for a search warrant on the Defendant's residence, Spec. Agt. Cramsey stated the Defendant purchased access to known child pornography websites on four differ occasions, September 29, 2006, October 5, 2006, October 7, 2006, and October 14, 2006. (Gov't. Ex. A). The search warrant was sign by the judge on August 8, 2007, and served upon the Defendant at his residence on August 17, 2007. (Tr. 27:11-13). The Defendant argues the search was invalid because the information presented in the affidavit was almost a year old when presented to Magistrate Judge Frazier and therefore, stale.

"[T]raditional concepts of staleness that might apply to the issuance of search warrants for contraband or drugs do not mechanically apply to situations, as here, where the object of the search is for images of child pornography stored on a computer." U.S. v. Miller, 450 F.Supp.2d 1321, 1335 (M.D. Fla. 2006). When reviewing staleness challenges, courts do not apply "some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, [but] rather [the court] reviews each case based on the unique facts presented." Id. (citing U.S. v Harris, 20 F.3d 445, 450 (11th Cir. 1994)). Therefore, in making a case by case determination, the Court "may consider the maturity of the information, nature of the suspected crime ... habits of the accused, character of the items sought, and nature and function of the premises sought to be searched." Miller, 450 F.Supp.2d at 1335. Consequently, "[w]hen a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.' " Id. (citing U.S. v. Irving, 432 F.3d 401, 416 (2d Cir. 2005)). "Because those individuals who possess and trade in child pornography tend to maintain the visual depictions they have downloaded for long

periods of time, most courts have refused to sustain staleness challenges to search warrants for computer images of child pornography. . . ." Miller, 450 F.Supp.2d at 1335.

The Middle District Court in Miller noted that Courts have even found search warrants valid for computer images of child pornography where the time lapse was greater than that in the instant case. Id. (citing Irving, 432 F.3d 401 (23 months between most recent information and issuance of warrant); U. S. v. Ramsburg, 114 Fed. Appx. 78, 82 (4th Cir.2004)(email image of child pornography obtained more than two years before warrant held not to be too stale); U. S. v. Chrobak, 289 F.3d 1043 (8th Cir.2002)(images intercepted three months before warrant not stale); U . S. v. Roby, 27 Fed. Appx. 779 (9th Cir.2001)(eight and one half month gap between downloaded files and warrant not stale); U. S. v. Hay, 231 F.3d 630, 636 (9th Cir.2000)(six month time period between transmission of child pornography images and warrant did not render information too stale); U.S. v. Bateman, 805 F. Supp. 1041 (D.N.H.1992)(seven month delay); U.S. v. Lamb, 945 F.Supp. 441 (N.D.N.Y.1996)(five month delay); U. S. v. Albert, 195 F.Supp.2d 267 (D.Mass.2002)(several months delay); U.S. v. Sherr, 400 F.Supp.2d 843 (D.Md.2005)(eight months delay)). As a result, the ten (10) to eleven (11) month gap in time between the Defendants purchase of the child pornography from the various websites did not render the information in Spec. Agt. Cramsey's affidavit too stale to use in obtaining a search warrant.

*(2) Whether the Search Warrant Failed the Particularity Requirement of the Fourth Amendment*

The Defendant argues the warrant fails to meet the Fourth Amendment's particularity requirement because it authorized a broader search than was supported by probable cause. He states because Spec. Agt. Cramsey was unsure of who occupied Unit # 302 along with the Defendant that the Search Warrant was invalid under the Fourth Amendment. (Tr. 70-71). The Fourth Amendment

requires that a warrant particularly describe the place to be searched and the items or persons to be seized; exploratory rummaging is prohibited. U.S. Const. Amend IV; U.S. v Evaschuck, 65 F. Supp. 2d 1360, 1365 (11th Cir. 1999) "Only items described in the search warrant may be seized." Id. (citing U.S. v Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990)).

The Defendant relies heavily upon the Supreme Court's decision in Maryland v. Garrison, 480 U.S. 79, 84-85, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). In Garrison, the police obtained a search warrant for the third floor of an apartment building believing that the entire third floor was one apartment. Id. at 82. However, when the police arrived to search the residence they discovered that the third floor was two (2) separate apartments instead of one unit. Id. The officers entered the apartment belonging to Garrison by mistake as the search warrant authorized the entrance of the apartment of a man named Lawrence McWebb. Id. at 80. The officers found cash, heroin, and drug paraphernalia in Garrison's apartment. Id. at 81. It was after the police had entered the wrong apartment that they realized that the third floor was actually two apartments and not a single unit. Id. Once they had discovered the error they halted the search of Garrison's apartment. Id.

The Defendant's reliance on Garrison is misplaced. In Garrison, the Supreme Court held

> Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

Garrison, 480 U.S. at 85. Based upon the information gathered from the various databases, a Search Warrant was issued for the Defendant's address at 1903 Mark Avenue, Unit #302, Punta Gorda, FL

33950. (Tr. 27:6-10). To further verify the information, an agent spoke with a resident of the apartment complex at that location and determined that "Mark and Rose" lived in unit #302 which was thought to be a three (3) bedroom efficiency. (Tr. 18:13-25, 14:1-2). The Search Warrant was limited to Unit # 302.

After they arrived on the scene, Spec. Agt Cramsey, knocked on what appeared to him to be the front door of Unit # 302, and announced his presence. (29:15-22). The Defendant came to door of the apartment, Spec. Agt. Cramsey identified himself, and the Defendant was asked to step outside while the agents did a security sweep of the residence. (Tr. 30:24-25,31:1-9). Upon entering through the door, Spec. Agt. Cramsey and the other officers that accompanied him, discovered they had entered into the Defendant's bedroom. (Tr. 31:13-17). Once inside, the search team discovered the residence did indeed consisted of three (3) bedrooms which shared a common dining room, bathroom, and kitchen. (Tr. 31:13-15). They discovered that one of the bedrooms was locked. (Tr. 31: 19). When asked about the locked room, the Defendant informed Spec. Agt. Cramsey that it belonged to his roommate, Willie, who was at work and the Defendant stated he did not have access to that bedroom. (Tr. 31: 20-23).

Unlike Garrison, Spec. Agt. Cramsey and the search team had good information regarding which apartment the Defendant occupied. They only searched within that one single apartment and then only the rooms to which the Defendant had access. When Spec. Agt. Cramsey discovered that another individual occupied the locked third bedroom, he did not conduct a search of that room. (Tr. 32:11-19). The search was limited only to the single apartment and not the entire complex and only the rooms in which the Defendant had access were searched. The Search Warrant specifically allowed Spec. Agt. Cramsey and the search party to seize computer hard drives, computer media,

disks, zip drives, and any visual depictions of child pornography. (Gov't. Ex. A). Based upon the inventory sheet of the seized items, that's all the officers seized from the Defendant's apartment. (Def. Ex. B). The only items seized were items directly related to the items listed in the Search Warrant. Therefore, the Search Warrant complied with the particularity requirements of the Fourth Amendment.

*(3) Whether the Agents Exceeded the Scope of the Search Warrant*

The Defendant argues that the agents exceeded the scope of the Search Warrant by staying on the premises longer than necessary to accomplish the Warrant's objectives. The Defendant argues that his bedroom is very small and the agents had completely photographed the entire area within a matter of minutes. As such, the Defendant alleges the agents were extending the time needed to search the apartment in order to interrogate the Defendant.

In his testimony, Spec. Agt. Cramsey detailed how the search took place. Spec. Agt. Cramsey stated that one agent was in charge of being the evidence custodian, one agent was in charge of photographing, one agent was charged with drawing diagrams of the apartment and marking where items were found, and one agent was specifically there to search the unit. (Tr. 34:14-23). The search involved locating and documenting files stored on CDs, actual pictures, thumb drives, photo albums had to be searched, drawers, and book shelves. (Tr. 42:14-25, 43:1-24). Spec. Agt. Cramsey stated that the entire process took about three (3) hours from initial contact to the agents leaving while the actual search and interview took about two hours. (Tr. 43:22-24, 50:23-25; 51:1-8 ). The Government submitted photos of the Defendant's room showing numerous CD's, book shelves with books, and papers distributed all over the room. Based upon the testimony of Spec. Agt. Cramsey

and the photos submitted by the Government of the Defendant's room, it is clear that the agents did not take excessive time in conducting the search of the Defendant's residence. (Def. Ex. B).

*(4) Whether the Defendant's Statements were Obtained in Violation of his Miranda Rights*

The Defendant states that any statements made by him during the search of his residence should be suppressed because Spec. Agt. Cramsey interviewed him during the entire time the search was ongoing without reading him his Miranda rights. The Government responds, the Defendant was never in custody and, therefore, any statements were freely and voluntarily made without the necessity of Miranda warnings.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. A person need only be informed of his Miranda rights if he is in custody and is being interrogated. Id. at 478-479. The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police. . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 110 S. Ct. 1682 (1980).

In this instance, Spec, Agt. Cramsey told the Defendant at the beginning of the search that he was not under arrest, that he would not be arrested that day, and further, that he was free to leave. (Tr. 36:11-21). The Defendant acknowledged that he understood he was free to leave. (Tr. 36:11-

21). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. 384 U.S. at 444. Clearly, the Defendant was not in custody as defined by Miranda.

Furthermore, purely voluntary statements made by a defendant are not barred by Miranda. 384 U.S. at 478. There is a two part inquiry into whether or not a defendant's waiver of Miranda rights was voluntary, knowing, and intelligent. U.S. v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)(citing Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). "First, the relinquishment of the right must have been voluntary in the sense voluntary that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Barbour, 70 F.3d at 585. "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. "Only if the totality of the circumstances surrounding the interview reveal an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id.

After the Defendant was told that he was free to leave, the Defendant agreed to stay and talk to Spec. Agt. Cramsey. (Tr. 36:19-21). Spec. Agt. Cramsey told the Defendant he was going to ask him some questions and that he could either answer the questions or refuse to answer. (Tr. 36:19-25, 37:1-4). He further informed the Defendant that at any point during the interview, he could stop and state he no longer wanted to talk. (Tr. 37:3-4). The Defendant agreed to stay and talk with Spec. Agt. Cramsey. (Tr. 37:5-7). Spec. Agt. Cramsey testified that at no time did he threaten, or coerce, or make promises to the Defendant to get him to talk to him. (Tr. 52:12-18). It is also evident from the record that no coercion nor threats were used to encourage the Defendant to talk. The Defendant was able to get up and make coffee and was free to go outside and take a smoke break. (Tr. 38:12-

25). The Court concludes the Defendant was not in custody and that he freely and voluntarily stayed and spoke with Spec. Agt Cramsey, and therefore, it is respectfully recommended the Defendant's Miranda rights were not violated.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant's Motion to Suppress Evidence (Doc. #22) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** at Fort Myers, Florida, this 7th day of February, 2008.

Sheri Polster Chappell

**SHERI POLSTER CHAPPELL**
**UNITED STATES MAGISTRATE JUDGE**

Copies: All Parties of Record